UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Harry L. Hollingsworth,

     Plaintiff,

v.                                     Case No.  13-11625

                                         Honorable Sean F. Cox

Ford Motor Co. and International Union,
United Automobile, Aerospace, and Agricultural
Implement Workers of America, Local 600,

     Defendants.
_____/

## OPINION AND ORDER GRANTING UAW'S MOTION FOR SUMMARY JUDGMENT, GRANTING FORD'S MOTION FOR SUMMARY JUDGMENT, AND DENYING FORD'S MOTION FOR SANCTIONS

This case is, at its core, a contract dispute.  Plaintiff Harry Hollingsworth ("Plaintiff") alleges that Defendant Ford Motor Company ("Ford") breached a Grievance Settlement Agreement that was negotiated by Defendant International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") on Plaintiff's behalf after Ford terminated Plaintiff's employment.  Plaintiff also alleges that the UAW breached its duty of fair representation when it failed to file a grievance on Plaintiff's behalf regarding Ford's alleged breach of the Grievance Settlement Agreement.

This matter is before the Court on Defendant UAW's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 (Doc. #50), Defendant Ford's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 (Doc. #52), and Defendant Ford's Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C. section 1927 (Doc. #74). The motions have been fully and extensively briefed by the parties, and the Court heard oral

arguments on December 4, 2014.

For the following reasons, this Court shall GRANT UAW Local 600's Motion for Summary Judgment, GRANT Ford's Motion for Summary Judgment, and DENY Ford's Motion for Sanctions.

## BACKGROUND

### A.    Plaintiff's Termination From Ford and the Grievance Settlement Agreement

Plaintiff Harry Hollingsworth was terminated from his employment at Ford Motor Company on May 18, 2009 for allegedly misusing company funds.  (Pl.'s Stmt, Doc. #57, at ¶ 2; UAW Stmt. At ¶ 2; Pl. Dep., attached to UAW Mo. at Ex. A p. 144).  He had been employed by Ford since 1978. (Pl.'s Stmt, Doc. #57, at ¶ 1; UAW Stmt. at ¶ 1).  As a then-active union member, Plaintiff complained about his termination to his union, UAW Local 600.  UAW Local 600 then filed a grievance on Plaintiff's behalf on May 20, 2009.  (Pl. Stmt., Doc. #57, at ¶ 3; UAW Stmt. at ¶ 3; UAW Mo. at Ex. B).  The grievance procedure between the UAW and Defendant Ford is governed by a Collective Bargaining Agreement ("CBA").  (Dep. of Anthony Richard, Pl. Stmt. Doc. #57 at Ex. E, p. 16).

On August 25, 2010, the UAW, Ford, and Plaintiff settled the grievance.  (Pl. Stmt., Doc. #57 at 4; UAW Stmt. at ¶ 4; *see* Grievance Settlement Agreement, attached to UAW Mo. at Ex. C). The Grievance Settlement Agreement provided that

> [Plaintiff] will be reinstated and afforded the opportunity to elect one of the separation packages for which he is eligible.  A lump sum payment of $20,000 is awarded as full and complete settlement . . .  Reinstatement under this grievance settlement is for the sole purpose of allowing [Plaintiff] to apply for a separation package and will not allow [Plaintiff] to return to active employment within Ford Motor Company or activate any other economic benefit (i.e. vacation entitlement, Christmas bonus, lump-sum payments, etc.) associated with active employment status.

(Grievance Settlement Agreement, UAW Mo. at Ex. C) (emphasis added).

2

Plaintiff elected to receive a Special Retirement Incentive separation package worth an additional pre-tax amount of $40,000. (Special Retirement Incentive Request, attached to UAW Mo. at Ex. D). At his deposition, Plaintiff was asked whether he understood that deductions could be made from his lump-sump grievance settlement check, and he agreed that he did have that understanding:

> Q:    You understood that your lump sum would be in the pre-tax amount of $20,000, and applicable taxes would be deducted, correct?
>
> A:    Um-hmm. Yes.
>
> Q:    Okay. And you also understood that the payment would be reduced by any outstanding debts to the company or trustees of any company benefit plan or program including unpaid overpayments under the SUB plan, correct?
>
> A:    Correct.

(Pl. Dep., UAW Mo. at Ex. A, p. 87-88). Plaintiff's retirement from Ford became effective on September 1, 2010. (Pl. Stmt., Doc. #57, at ¶16; Pl. Dep, UAW Mo. at Ex. A, p. 88).

**B.    Plaintiff's Alleged Debt Owed To Ford**

Prior to Plaintiff's retirement, Ford had been deducting $100.00 from each of Plaintiff's paychecks because Ford's records showed that Plaintiff had previously received a benefit overpayment. (UAW Stmt. at ¶ 17, 18; Pl. Dep., UAW Mo. at Ex. A, p. 89; *see* Benefit Overpayment Letter, attached to UAW Mo. at Ex. G). Plaintiff denies that he received a benefit overpayment prior to his retirement. (Pl. Stmt., Doc. #57, at ¶ 17; Pl. Dep., UAW Mo. at Ex. A, p. 89).

Also prior to his retirement, Ford was attempting to recover a "Visa balance" of $6,140.36 from Plaintiff. (UAW Stmt. at ¶ 20; Pl. Stmt. at ¶ 20; Pl. Dep., UAW Mo. at Ex. A, p. 99). Ford appears to claim that Plaintiff accrued this debt by misusing a Ford-issued credit card for non-

3

approved expenses.  Plaintiff disputes that he owed a Visa balance to Ford, as he claims he did not

have a Ford-issued credit card.  (Pl. Dep., UAW Mo. at Ex. A, p. 99; Pl. Aff., attached to Pl. Stmt.,

Doc. #57, at Ex. B).

## C.   Ford's Erroneous Payments To Plaintiff After His Termination

During discovery, Plaintiff produced several checks that he received from Ford after his

September 2010 retirement.

On September 1, 2010, Plaintiff received a check for a "SUB" (supplemental unemployment

benefits) payment in a gross amount of $403.69.  (UAW Mo. at Ex. K; Pl. Dep. at 115).  Plaintiff

produced four additional checks issued by Ford to him for SUB payments, each in the gross amount

of $403.60.  (UAW Mo. at Ex. K).

Plaintiff received another check, dated November 7, 2010, for vacation pay in a gross

amount of $4,272.00.  (UAW Mo. at Ex. J).  Additionally, it is undisputed that Plaintiff receive a

profit sharing check for a gross amount of $831.10, net amount of $510.39, in March of 2011.

(UAW Mo. at Ex. M; Pl. Dep. at 119)  It is unclear whether Plaintiff admits that he cashed any or

all of these checks, but Plaintiff does not dispute that he did not return any of these checks back to

Ford.  (Pl. Dep at 115; Pl. Stmt., doc. #57 at ¶ 27; UAW Stmt. at ¶ 27).

Ford maintains that all of these checks bestowed upon Plaintiff benefits to which he was not

entitled, and were therefore issued in error.  Plaintiff does not dispute that he was not entitled to

receive the vacation benefits, SUB benefits, or profit sharing bonuses.  (Pl. Stmt., Doc. #57, at ¶ 25;

UAW Stmt. at ¶ 25; Pl. Stmt., Doc. #57, at ¶ 14; UAW Stmt. at ¶ 14).  Plaintiff also appears to agree,

as he must, that the Grievance Settlement Agreement expressly states that Plaintiff's reinstatement

was not intended to activate any other economic benefit.  (Pl. Stmt., Doc. #57, at ¶ 8; UAW Stmt.

4

at ¶ 8).

**D.    Ford's First Two Separation Payments To Plaintiff**

In November 2010, Plaintiff received two separation checks from Ford.  The first check had a gross amount of $20,000 and a net amount of $9,696.77.  (Pl. Aff., attached to Pl. Stmt., Doc. #57 at Ex. B ¶ 28; UAW Mo. at Ex. I) ("Check #1").  Check #1 indicates that deductions were made for taxes, as well as a "benefit overpa" in the amount of $2,403.23.  (UAW Mo. at Ex. I).  Plaintiff agrees that, at least according to Ford's records, he owed them $2,403.25 for benefit overpayment. (Pl. Dep at 103-104).

The second check ("Check #2") was issued for a gross amount of $20,000, but a net amount of $12,100.  (UAW Stmt. at ¶ 21; Pl. Stmt. at ¶ 21; Pl. Dep. at 100-101; Check #2, attached to UAW Mo. at Ex. H).  The only deductions made from Check #2 were for federal, state and local income taxes.  (UAW Mo. at Ex. H).

**E.    Plaintiff's Final Grievance Settlement Check**

On April 6, 2011, Plaintiff received a third and final separation check from Ford.  (Pl. Aff., attached to Pl. Stmt., Doc. #57 at Ex. B ¶ 29).  This check contained the word "GRIEVANCE" in the description line.  ("Grievance Check," UAW Mo. at Ex. N).  The Grievance Check was issued for a gross amount of $20,000, but a net amount of $3,692.10.  (UAW Mo. at Ex. N).  It appears, from the face of the Grievance Check, that Ford made a "base adjustment" of $13,276.02, which resulted in an adjusted pre-tax amount of $6,728.98.  (UAW Mo. at Ex. N).  Plaintiff claims that he misplaced the Grievance Check after it was initially issued, but found it after the time for depositing it had expired.  (Pl. Dep. at 134-135).  Plaintiff contacted Ford in September 2012, and Ford reissued the Grievance Check, which Plaintiff promptly deposited.  (*Id.*).

Ford maintains that the deductions from the Grievance Check were made to reclaim the amounts issued to Plaintiff in error, including the profit sharing check, the SUB checks, and the vacation pay check.  Plaintiff claims that the first time he received an explanation regarding the separation check deductions was on December 11, 2012 when Ford responded to his attorney's inquiry regarding the same.  (Pl. Add'l Stmt., Doc. #57, p. 22 ¶ 43).

**F.     Plaintiff's Communications With UAW Local 600 Regarding Grievance Check Deductions**

Plaintiff claims that, on the day he received the Grievance Check, he contacted UAW Local 600 regarding the deductions.  (Pl. Dep. at 139).  Plaintiff testified that he spoke to Anthony Richard, ("Richard") who is the first vice president of UAW Local 600.  (Dep. of Anthony Richard, attached to Pl. Stmt., Doc. #57, at Ex. E p. 12).  By way of affidavit, Plaintiff testified that, at that time, he "was informed by Michael Robison and Anthony Richard that they and UAW Local 600 were communicating with Ford on [his] behalf throughout 2011 and 2012 regarding Ford's wrongful withholdings from" two of the separation checks.  (Pl. Aff,  attached to Pl. Stmt., Doc. #57 at Ex. B ¶ 41).  Plaintiff claims that he called Anthony Richard "thousands of times" to follow up with him concerning the allegedly erroneous deductions.  (Pl. Dep. at 140).  Plaintiff was asked if he "talk[ed] to [his] union representative [who was Tony Richard]" about the Grievance Check and the first separation check, both from which deductions were made by Ford.  Plaintiff responded:

> Well, I just told him that I had received a SUB check and that – the check for the 510.  And he told me he didn't have no knowledge of what that was all about, and that he was still trying to file a grievance as to what was the money taken out check for.  That was what I was told, he was still working on it.

(Pl. Dep. at 187).

Anthony Richard testified that Plaintiff never asked him to file a grievance.  (Richard Dep

at 98).  However, Richard testified that Plaintiff called him and asked him "to look into why money was deducted" from Plaintiff's April 2011 Grievance Check.  (Richards Dep. at 52).

Richard testified that he did investigate why the money was deducted by contacting Evell Walk in Ford's Human Resources Department.  (Richard Dep. at 52-53).  Richard did not get an immediate answer, but Walk told him that he would try to get an answer.  (Richard Dep. at 53). Richard later followed up with Walk, and Walk stated that he was still trying to get an answer. (Richard Dep. at 53).

Richard never obtained an explanation for the deductions from Walk.  (Richard Dep. at 53). According to Richard, Walk represented to him that "they [Ford] were going to give him [Plaintiff] an answer."  (Richard Dep. at 54).  Richard further elaborated on his subsequent discussions with Plaintiff:

> Q:    Were you updating Mr. Hollingsworth during, you know, these conversations you had during the summer of 2011 with Evell Walk?
>
> A:    Eventually he would call, or I would see him at social events.
>
> Q:    Did Mr. Hollingsworth continue asking you what was going on with the deductions, why the money was taken?
>
> A:    He would ask me, or I would ask him if he had an answer yet, and his response was no, he hadn't had an answer yet.
>
> Q:    Did he ask you to continue following up?
>
> A:    No.
>
> Q:    He didn't?
>
> A:    As a courtesy, I told him I would follow up.
>
> Q:    Did you ever express to Mr. Hollingsworth that you would not continue to follow up with Ford regarding these deductions?

A:      No, 'cause I never knew if he had an answer or not.

Q:      And you never put anything in writing to Mr. Hollingsworth saying that the union would not continue to pursue the deductions from the checks?

A:      Right.

. . .

Q:      So Mr. Hollingsworth would have no reason to know that the union was not following up with these deductions from the checks?

A:      You say the union is following up with the deductions, he wouldn't have any reason of knowing?

Q:      He wouldn't have any reason of knowing that they were not going to follow up with the checks?

A:      Never said that they weren't –

Q:      Okay.

A:      – going to follow up with the checks.

Q:      So it's accurate that Mr. Hollingsworth would have thought the union was following up with these checks, the deductions taken out of the checks?

A:      I did it as a courtesy for him to check, to find out what deductions were being taken out. I felt, from a union standpoint, the company should have at least told him what those deductions were. And all my efforts were from a courtesy standpoint to find out what those deductions, he should know what those deductions were.

Q:      What do you mean by "courtesy standpoint"?

A:      He was retired, so his conversations with me were basically, when we were at a function, he would mention it. He would say, "Hey, I still need to know what those deductions were."  I'd say, "Okay, I'll doublecheck."

Q:      Don't you have a duty, wouldn't the union or yourself, since you were a large part of the . . . grievance settlement –

A:      Right.

8

Q:      – have a duty to see those terms were fully satisfied, whether Mr. Hollingsworth's retired or not?

A:      From a UAW standpoint, those terms were obligated because of the $20,000, which the check . . . shows, he had $20,000.  That was the settlement, is $20,000.

. . .

A:      . . . I don't have anything to do with the deductions. The gross amount on the agreement was $20,000, and that's what he got. If they took anything else beyond that, I do not know. The settlement was for $20,000. That's what I agreed on, that's what he agreed upon, that's what we signed on, and that's what the check was for, $20,000. As to what his net is, I have no control over that.

(Richard Dep., Doc. #57, Ex. E at pp. 52-57).

Plaintiff has no record indicating that he sent any written correspondence to UAW Local 600 before his attorney contacted them in January of 2013.  (Pl. Dep at 156.).  Plaintiff has no evidence indicating that he filed any charges pursuant to the bylaws of the Local 600 claiming that he was not being properly represented.  (Pl. Dep. at 156).

It is also undisputed that no grievance regarding the deductions was ever filed on Plaintiff's behalf.  Plaintiff claims that "the Union led [him] to believe for over 1.5 years that it would file a grievance on his behalf against Ford and then refused to do so on January 17, 2013."  (Pl. Add'l Stmt., Doc. #57 at p. 22 ¶ 42).

## G.      UAW Constitution

Article 33 of the International UAW Constitution ("UAW Constitution") provides for an internal appeals procedure from actions of a Local Union, or any of its units, committees, officers, committeepersons, or stewards.  (International UAW Constitution, attached to UAW Mo. at Ex. Q,

9

p. 87).  The UAW Constitution provides that

> in any challenge to the handling or disposition of a grievance: Where the challenge is against a Local Union committeeperson, steward, Bargaining Committee, officer or other Local Union official the levels of appeal are first to the unit of an Amalgamated Local Union, then to the Union; then to the Internal Executive Board and then to the Convention Appeals Committee, or where appropriate the Public Review Board . . . .

(UAW Constitution, UAW Mo. at Ex. Q, p. 87).  In an appeal to the Amalgamated Local Union, the appeal "must be made first at a meeting of the membership body of the appellant's unit or in writing addressed to the Recording Secretary or Chairperson of the appellant's unit."  (*Id.* at 89).  Article 33, section 4 provides that "[a]ny appeal . . . shall be made in writing, except as otherwise provided for in this Constitution . . ."  (*Id.* at p. 94).  Article 33, section 5 of the UAW Constitution requires that an aggrieved member must fully exhaust all internal union appeals "before going to a civil court or governmental agency for redress."  (UAW Mo. at Ex. Q p. 96).

UAW claims that Plaintiff never made or filed any complaint or appeal pursuant to the UAW Constitution.  (UAW Stmt. at ¶ 44).  Plaintiff attempts to deny this allegation by way of affidavit. (Pl. Stmt., Doc. #57 at ¶ 47; Pl. Aff. at ¶¶ 43, 45).  However, Plaintiff's deposition testimony on this issue is clear:[1]

> Q:   Okay. Did you ever file a complaint or charge against any member of Local 600 pursuant to the International Constitution that you were dissatisfied with the representation you received from Local 600?
>
> A:    Do I have anything in writing?

---

[1] A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614, 619 (6th Cir. 2001) citing *Reid*, 790 F.2d at 460.  Therefore, where Plaintiff's June 2014 affidavit directly contradicts his prior deposition testimony, the prior deposition testimony controls.

Q:    Yeah. Did you submit anything in writing pursuant to the International UAW Constitution saying you were not satisfied or that you were complaining about the acts of any representative of Local 600 in representing you?

A:    No, I don't have anything in writing.

Q:    So you never filed anything in writing with the International?

A:    No.

Q:    Okay.

A:    I went to the International and talked to them about it.

Q:    You didn't file anything in writing, though, did you as required by the Constitution?

A:    No.

Q:    All right.

(Pl. Dep at 156-157). It is therefore undisputed that Plaintiff did not file a written appeal pursuant to the UAW Constitution. Nor does Plaintiff claim that he made an oral appeal at an Amalgamated Local Union Meeting.

**H.    Plaintiff's Union Membership**

Ford terminated Plaintiff's employment on May 19, 2009. Plaintiff formally retired on September 1, 2010. Plaintiff is no longer an active member of UAW Local 600, although it is unclear exactly when his active membership in UAW Local 600 ceased. (Pl. Dep. at 158). It is undisputed that Plaintiff no longer pays dues to the UAW Local 600. (Pl. Dep. at 159). Rather, he is a dues-paying member of the retiree chapter. (Pl. Dep. at 159).

**I.    Procedural History**

Plaintiff filed this lawsuit in 36th District Court, Wayne County, Michigan on March 12, 2013. (Notice of Removal, Doc. #1). The Complaint alleges Count I - Breach of Contract as to

11

Ford; and Count II - Violation of section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. section 185 as to Ford and UAW Local 600.  (Doc. #1).  In Count II of Plaintiff's Complaint, Plaintiff specifically alleges that "Ford's material breach of the Grievance Settlement and Separation Package violates the collective bargaining agreement between Ford and UAW Local 600."  (Pl.'s Compl. at ¶ 38).

On April 10, 2013, Ford removed the case to this Court on the basis of federal question jurisdiction.  (Doc. #1).  On April 15, 2013, Ford filed a Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c).  (Doc. #8).  In its motion, Ford argued, in pertinent part, that Plaintiff's LMRA claim was a "hybrid" section 301 claim, and that Plaintiff's state-law breach of contract claim was preempted by the LMRA. (Doc. #8).

This Court converted Ford's motion for judgment on the pleadings to a motion for summary judgment.[2]  At that point, the only documents the Court had for its consideration consisted of the pleadings and a few affidavits, including an affidavit from Plaintiff.

On December 30, 2013, this Court issued an Opinion and Order Granting in Part and Denying in Part Defendant Ford's Motion for Summary Judgment.  (Doc. #25).  In that Opinion and Order, this Court held that Plaintiff's state-law breach of contract claim was preempted by the LMRA.  (Doc. #25 at 6-7).  The Sixth Circuit has explained that when a state-law claim would require interpretation of a collective bargaining agreement, it is preempted by section 301 of the

---

[2] Ford originally styled its motion as one for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c).  However, because both parties attached evidence to their briefs that was not attached to or contained in the pleadings, the Court allowed the attachments and converted Ford's motion to one for summary judgment pursuant to Fed. R. Civ. P. 56, as required by Fed. R. Civ. P. 12(d).  (Doc. #21).  The Court permitted the parties to file any additional materials for the Court's consideration, although Ford's motion was filed pre-discovery.

LMRA.  (Doc. #25 at 6-7, citing *Paul v. Kaiser Foundation Health Plan of Ohio*, 701 F.3d 514, 519 (6th Cir. 2012) and *Jones v. General Motors Corp.*, 939 F.2d 380, 382 (6th Cir. 1991)).

Based on the parties' submissions, and Plaintiff's Complaint in particular, the Court found that Plaintiff's breach of contract claim would require interpretation of the CBA because Plaintiff specifically alleged, and intended to prove, that 1) Ford breached the CBA between it and UAW Local 600, and 2) UAW Local 600 breached its duty of fair representation.  (Doc. #25 at 7-8; *see also* Pl. Compl. at ¶ 38).  Accordingly, this Court determined that Plaintiff's state-law breach of contract claim could not proceed alongside Plaintiff's hybrid section 301 LMRA claim and held that the LMRA preempted Plaintiff's state-law breach of contract claim.

On May 23, 2014, UAW filed its Motion for Summary Judgment on Plaintiff's remaining claim.  (Doc. #50).  Plaintiff responded, (Doc. #56), and UAW replied.  (Doc. #63).[3]

On May 23, 2014, Ford filed a Motion for Summary Judgment, (Doc. #52), with a separate Statement of Material Facts Not In Dispute (Doc. #51).  Plaintiff responded, (Doc. #55) with a separate Counter-Statement of Material Facts Not In Dispute (Doc. #58).  Ford replied,  (Doc. #65), and also filed a response to Plaintiff's counter-statement of facts (Doc. #64).

On June 20, 2014, Magistrate Judge Michael Hluchaniuk extended the original discovery deadline of April 22, 2014 for the sole purpose of allowing the depositions of Kathleen Beaudoin ("Beaudoin") and Cathy Carpenter ("Carpenter") to proceed.  (Doc. #62).

On September 3, 2014, this Court granted Plaintiff's Motion for Leave to File Supplemental Oppositions to Defendants' Summary Judgment Motions (Doc. #67) to incorporate the testimony

---

[3] This Court later struck UAW's reply for failure to comply with the Local Rules and Practice Guidelines (Doc. #81). It was re-filed as Doc. #82.

of Beaudoin and Carpenter.  Plaintiff filed a supplemental response to Ford's motion (Doc. #68).

Plaintiff filed a supplemental response to UAW's motion (Doc. #69) to which UAW replied.  (Doc.

#70).

STANDARD OF DECISION

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1984), *quoting* FED. R. CIV. P.

56(c).

"The party that moves for summary judgment has the burden of showing that there are no

genuine issues of material fact in the case."  *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376,

378 (6th Cir.1993).  "The moving party may meet its burden by showing that the nonmoving party

lacks evidence to support an essential element of its case."  *Barnhart v. Pickrel, Schaeffer & Ebeling

Co.*, 12 F.3d 1382, 1389 (6th Cir. 1993).  The plaintiff must come forth with more than a "mere

scintilla of evidence" in support of his or her position in order to survive summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  "The court must view the evidence, all

facts, and any inferences that may permissibly be drawn from the facts in the light most favorable

to the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).

ANALYSIS

**I.      UAW's Motion for Summary Judgment**

Plaintiff has chosen to proceed in this case on a hybrid section 301 claim under the LMRA.

29 U.S.C. § 185. Section 301 of the LMRA provides that "[s]uits for violation of contracts between

14

an employer and a labor organization representing employees in an industry affecting commerce .

. . may be brought in any district court of the United States having jurisdiction of the parties . . . ."

29 U.S.C. § 185(a).

"A hybrid § 301 suit implicates the interrelationship among a union member, his union, and

his employer." *Vencl v. Int'l Union of Operating Engineers, Local 18*, 137 F.3d 420, 424 (6th Cir.

1998), citing *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 561 (6th Cir. 1990). "To recover

against a union under § 301, the union member must prove both (1) that the employer breached the

collective bargaining agreement and (2) that the union breached its duty of fair representation."

*Garrish v. Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am.*, 417 F.3d 590,

594 (6th Cir. 2005), citing *Vencl*, 137 F.3d at 424. "If both prongs are not satisfied, Plaintiffs cannot

succeed against any Defendant." *Id.*  Therefore, if this Court grants UAW's motion for summary

judgment, it must also grant Ford's motion for summary judgment automatically; under a hybrid

section 301 theory of recovery, Plaintiff cannot recover against either Defendant unless he can prove

his claims against both of them individually.

UAW argues that it is entitled to summary judgment because 1) Plaintiff's claim is time-

barred; 2) Plaintiff failed to exhaust internal union remedies before filing suit; 3) Plaintiff has no

evidence that UAW breached its duty of fair representation, and 4) UAW did not owe Plaintiff a

duty of fair representation because Plaintiff was a retiree at the time of Ford's alleged breach of the

Grievance Settlement Agreement.

### A.    UAW Did Not Owe Plaintiff, A Retiree, A Duty of Fair Representation.

UAW argues that it did not owe Plaintiff a duty of fair representation because, after Plaintiff

retired September 1, 2010, he was no longer an active member of UAW Local 600.  Plaintiff admits

15

that he is no longer an active, dues-paying member of UAW Local 600.  (Pl. Dep. at 158-159).

The Court finds Plaintiff's retiree status warrants the grant of summary judgment in Defendants' favor.  The case law appears to be settled on this issue: "[b]ecause retired workers are no longer employees included in the collective bargaining unit, 'the bargaining agent is under no statutory duty to represent them.'"  *Yolton v. El Paso Tennessee Pipeline Co.*, 668 F. Supp. 2d 1023, 1033 (E.D. Mich. 2009), quoting *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n. 20 (1971); *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476, 1484 (6th Cir. 1983) ("the union has no duty to represent retirees with the employer, although it may choose to do so . . . ."); *Mochko v. Acme-Cleveland Corp.*, 826 F.2d 1064 (6th Cir. 1987) ("It is settled law that retirees, not meeting the definition of 'employees' under the Labor Management Reporting Act, 29 U.S.C. § 152(3), are not entitled to representation by the union, since such representation would actually give rise to a conflict of interest between the demands and concerns of active employees and retirees."); *Benedict v. United Inter-Mountain Tel. Co.*, 820 F. Supp. 354, 356 (E.D. Tenn. 1993) ("Because these retirees are not current employees, and even though they may have been members of the bargaining unit at one time, the Court finds that the defendant unions in this case owed these retirees no duty in regard to health benefits . . . .").

Plaintiff officially retired from Ford on September 1, 2010.  Plaintiff has admitted that he is not an active member of UAW Local 600.  He pays dues to the retiree chapter, not to UAW Local 600.  (Pl. Dep. at 159).  Plaintiff could not point to any language in the collective bargaining agreement that would permit him to file a grievance as a retiree.  (Pl. Dep. at 163).  Plaintiff has come forth with no evidence that UAW Local 600 had a duty to him, as a retiree, to further represent

him regarding disputes between him and Ford that developed post-retirement.  The Court finds that Plaintiff has failed to identify a genuine issue of material fact to warrant trial.  Therefore, the Court shall GRANT UAW's Motion for Summary Judgment because UAW did not owe Plaintiff a duty of fair representation at the time Ford allegedly breached the Grievance Settlement Agreement.

## II.     Ford's Motion for Summary Judgment

In order for Plaintiff to prevail on his hybrid section 301 LMRA claim, he must prove *both* that the union breached its duty of fair representation *and* that his employer breached the CBA.  *Garrish*, 417 F.3d at 594, citing *Vencl*, 137 F.3d at 424.  Because the Court finds that Plaintiff cannot prove that the union breached its duty of fair representation, the Court shall GRANT Ford's Motion for Summary Judgment.

## III.    Defendant Ford's Motion for Sanctions

On September 5, 2014, with this Court's permission, Plaintiff filed supplemental briefs in response to Defendants' motions for summary judgment.  (Docs. #68, 69).  Plaintiff's supplemental briefs were based on the deposition testimony of Beaudoin, who was the Ford payroll analyst who processed Plaintiff's settlement/separation checks.  (Beaudoin Dep., attached to Ford's Mo., Doc. #74, at Ex. 2 p. 13-15).  The parties did not depose Beaudoin until after the discovery deadline; at that point, Defendants' motions for summary judgment had already been fully briefed.

In Plaintiff's Supplemental Opposition to Ford's Motion for Summary Judgment, Plaintiff argued that Beaudoin's testimony was further evidence that there was a genuine issue of material fact for trial.  Specifically, Plaintiff made four arguments related to Beaudoin's testimony:

1)      "Ms. Beaudoin never actually saw, or even considered, the Grievance Settlement prior to calculating the wrongful deductions." (Pl. Supp. Resp., Doc. #68, at 2, citing Beaudoin Dep. at pp. 1-12; 50, 61).

2)      "Significantly, Ms. Beaudoin testified that she was aware of the Grievance Settlement but admitted that that [sic] she never saw or used the Grievance Settlement signed by Plaintiff when she calculated the wrongful deductions."  (Pl. Supp. Resp., Doc. #68, at 4, citing Beaudoin Dep. at p. 15).

3)      "Defendant Ford's own employee admits that she never even looked at the language in the Grievance Settlement, let alone made the wrongful deductions pursuant to any supposed language in the Grievance Settlement."  (Pl. Supp. Resp., Doc. #68, at 5, citing Beaudoin Dep. at pp. 15, 61).

4)      "Ms. Beaudoin unequivocally admitted in her deposition testimony that she never saw the Grievance Settlement and that she never used the Grievance Settlement signed by Plaintiff when she calculated the wrongful deductions."  (Pl. Supp. Resp., Doc. #68, at 6-7, citing Beaudoin Dep. at p. 15).

Ford argues that "Plaintiff's brief is a complete distortion of the record and attempts to mislead the Court by mischaracterizing Ms. Beaudoin's testimony."  (Ford. Mo., Doc. #74, at 3). Ford claims that Plaintiff intentionally declined to include or acknowledge these other relevant portions of Beaudoin's testimony:

Q:      I'm going to hand you what was previously marked as [the Grievance Settlement]. Miss Beaudoin, have you ever seen this document before?

A:      I'm not sure if this was the exact document.  Actually, no.  I have not seen this one.

    . . .

Q:      Can you explain what you saw that was not exactly this document?

A:      It would be a final settlement letter that was written up I believe.

Q:      And you didn't have any other authority [to make the deductions] other than the Grievance Settlement?  Well, strike that.  You testified earlier that you had never seen [the Grievance Settlement], correct . . . .

A:      I testified that I don't know if I received this one.  What I received for the settlement, the Grievance Settlement, had verbiage that has the same verbiage.  I don't know if this was the exact form that was sent to me to process the grievance payment, but the verbiage was the same verbiage on the form that I received.  We're going back three years.

18

(Ford Mo., Doc. #74, at Ex. 2 pp. 15, 61-62).  Ford argues that, by intentionally omitting this portion of Beaudoin's testimony from its supplemental brief, Plaintiff has blatantly misstated the evidence and mislead the Court, and therefore sanctions are appropriate pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C. section 1927.

On September 25, 2014, four days before Ford filed the Motion for Sanctions, Plaintiff filed a "Motion for Leave to File Plaintiff's Supplemental Brief In Clarification/Amendment."  (Doc. #73).  In that motion, Plaintiff disputes that it misrepresented Beaudoin's testimony.  However, Plaintiff appears to argue that, even considering those previously-omitted portions of Beaudoin's testimony, there is a genuine issue of material fact as to whether the Grievance Settlement Agreement permitted the deductions.  (Doc. #73).  The Court granted Plaintiff's motion for leave to file this supplemental brief on November 19, 2014, which Plaintiff filed on November 20, 2014. (Doc. #84).

### A.    Federal Rule of Civil Procedure 11

Federal Rule of Civil Procedure 11 states, in pertinent part, that

"[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (2)      . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3)      the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery;
>
> (4)      the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonable based on belief or a lack

19

of information.

Fed. R. Civ. P. 11 (b)(2)-(4). This rule further provides that

> [i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

Fed. R. Civ. P. 11(c)(1). The central purpose of Rule 11 is to deter baseless filings. *Cooter v. Gell & Hartmax Corp.*, 496 U.S. 384, 393 (1990). "The first and most important factor [in determining whether to make an award of sanctions] is deterrence." *Danvers v. Danvers*, 959 F.2d 601, 605 (6th Cir. 1992), citing *Jackson v. Law Firm*, 875 F.2d 1224, 1229-30 (6th Cir. 1989). The second factor to be considered concerns compensating the non-violating party for the costs associated with the violation. *Id.* ("[T]he sanctions are meant to compensate the party receiving the award for expenses incurred in litigating the improperly filed suit and the sanctions motion."). The third factor to be considered is mitigation: "[t]he moving party must mitigate its expenses in responding to papers that violate the rule." *Id.* Good faith is not a defense to Rule 11 sanctions. *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414, 419 (6th Cir. 1992), citing *Jackson*, 875 F.2d at 1229.

A party intending to file a motion for sanctions pursuant to Rule 11 must first comply with the "safe harbor" provision of that rule. The "safe" harbor provision provides that the filing party must first serve its motion for sanctions on the opposing party and then wait twenty-one (21) days. Fed. R. Civ. P. 11(c)(2). During that twenty-one day period after service of the motion, the nonmoving party has an opportunity to "withdraw or appropriately correct" the challenged filing. Fed. R. Civ. P. 11(c)(2). If the non-moving party refuses to correct or withdraw the filing, then the moving party may file its motion for sanctions with the Court.

Here, Ford filed its Motion for Sanctions on September 29, 2014 (Doc. #74). It is undisputed that Ford served its motion on Plaintiff twenty-one days before it filed the motion, on or about September 8, 2014. Ford argues that Plaintiff "carved out" convenient parts of Beaudoin's testimony in an attempt to blatantly misstate the evidence and mislead the Court. (Doc. #74 at 5-6).

On September 25, 2014, prior to Ford's filing of its motion, Plaintiff filed a "Motion for Leave to File Plaintiff's Supplemental Brief In Clarification/Amendment." ("Clarification Brief," Doc. #73). Plaintiff appears to dispute that he misrepresented Beaudoin's testimony, and argues that he was merely highlighting the inconsistencies in Beaudoin's testimony. (Doc. #84). Nevertheless, Plaintiff's "clarification brief" acknowledges those portions of Beaudoin's testimony that were previously omitted from its supplemental brief.

The Court does not find that sanctions are warranted in this case because Plaintiff attempted to correct the misrepresentation before the motion for sanctions was filed. Plaintiff filed a Motion for Leave to File a Supplemental Brief prior to Ford's filing of its Motion for Sanctions. In its Motion for Leave, Plaintiff sought to clarify his prior position and to acknowledge the previously omitted testimony. (Doc. #73). This Court granted Plaintiff's motion.

The crux of Ford's accusation against Plaintiff is that he failed to accurately characterize Beaudoin's testimony in an attempt to stave off summary judgment. The Court finds that Plaintiff's supplemental brief effectively corrects this issue by acknowledging the previously omitted testimony. Further, Ford has not provided this Court with authority to show that sanctions are required under these circumstances. Therefore, the Court shall DENY Ford's Motion for Sanctions pursuant to Rule 11.

21

**B.    28 U.S.C. § 1927**

28 U.S.C. section 1927 provides that the Court may require any attorney or person to pay related costs, expenses and attorney's fees if that party "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927.  The Sixth Circuit has held that "§ 1927 sanctions require a showing of something less than subjective bad faith, but something more than negligence or incompetence. Thus, an attorney is sanctionable when he intentionally abuses the judicial process or knowingly disregards the risk that his actions will needlessly multiply proceedings." *Royal Oak Entm't, L.L.C. v. City of Royal Oak*, 316 Fed. App'x 482, 487 (6th Cir. 2009).  The statute's reference to vexatious multiplication of proceedings has been construed to "include conduct where an attorney knows or reasonably knows that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of non-frivolous claims." *Id.* (internal quotations and citations omitted).

The Court finds that Plaintiff's filing of the supplemental brief falls short of the standard required to grant costs and fees under section 1927.  It is true that Plaintiff omitted a portion of Beaudoin's testimony from his supplemental brief.  Yet, Plaintiff would have nevertheless been entitled to file a supplemental brief in order to apprise the Court of Beaudoin's deposition testimony because it was taken after the parties completed briefing on the summary judgment motions.  The Court finds that, in this way, Plaintiff's filing of the supplemental brief did not "multiply the proceedings" or "needlessly obstruct" litigation of this case.  The Court shall DENY Defendant Ford's Motion for Sanctions pursuant to 28 U.S.C. section 1927.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that UAW Local 600's Motion for

Summary Judgment (Doc. #50) is GRANTED; Defendant Ford's Motion for Summary Judgment

(Doc. #52) is GRANTED; and Defendant Ford's Motion for Sanctions (Doc. #74) is DENIED.

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  December 17, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 17, 2014, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager